UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT ALLEN DEBRUYN,
                              Petitioner,

v.                                              Case No. 23-10219
                                                Honorable Shalina D. Kumar
                                                Mag. Judge Elizabeth A. Stafford
ADAM DOUGLAS,
                              Respondent.

---

**OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING A CERTIFICATE OF APPEALABILITY**

---

Petitioner Scott Allen DeBruyn ("DeBruyn"), incarcerated at the Saginaw Correctional Facility in Freeland, Michigan, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, through his attorneys, David J. Kramer and Stuart Gary Friedman. DeBruyn challenges his conviction for delivering a controlled substance causing death, Mich. Comp Laws § 750.317a. For the reasons that follow, the petition for writ of habeas corpus is **DENIED WITH PREJUDICE.**

## I. Background

The material facts from DeBruyn's conviction are gleaned from the Michigan Court of Appeals' opinion, *See People v. Debruyn*, No. 352274, 2022 WL 981281, at * 1–3 (Mich. Ct. App. Mar. 31, 2022), which is

1

presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1).

*See Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016).

DeBruyn's conviction arose from the death of Camille Gesiakowski
("Gesiakowski"), who was found dead in DeBruyn's motel room on the
morning of April 12, 2017. On April 7, 2017, less than one week before she
died, Gesiakowski was released from jail where she had served roughly 8
½ months for violating her probation for charges related to drug use. While
incarcerated, Gesiakowski and DeBruyn communicated with each other.
The two discussed meeting up after Gesiakowski was released from jail to
use "oxy," a reference to the opioid oxycodone, as well as other drugs. In
several exchanges, Gesiakowski expressed a desire to use "oxys", to
which DeBruyn replied that he had some or could buy some. DeBruyn also
told Gesiakowski that he could buy some cans of compressed air,
commonly known as air duster, which are manufactured for use in cleaning,
but are sometimes used for inhaling or "huffing" to produce a disorienting or
euphoric effect.

When Gesiakowski was released from jail on April 7, 2017, DeBruyn
picked her up. The two went to a Walmart store where DeBruyn purchased
two cans of air duster and two bottles of wine. Gesiakowski's sister, Celia,
subsequently went to DeBruyn's house and discovered that Gesiakowski

2

was unresponsive, lying on a bed surrounded by pill bottles and a can of air duster. Celia also saw noticed alcohol bottles and guns standing against the wall. Celia revived Gesiakowski and took her to their parents' home.

Gesiakowski and DeBruyn subsequently exchanged numerous messages in which they discussed meeting to use drugs. DeBruyn mentioned his efforts to purchase "pills" and "duster."

Gesiakowski left her parents' house on the evening of April 9, 2017, meeting DeBruyn at his house after he purchased two cans of air duster. On April 10, 2017, DeBruyn purchased another four cans of air duster at Walmart. That same day, DeBruyn purchased 40 Percocet pills, a medication containing oxycodone and acetaminophen, from Lona Daniels and her boyfriend, Michael Montgomery.

On April 11, 2017, Gesiakowski's father Blake called the police and asked them to check on the welfare of his daughter at DeBruyn's house. The police went to the home but did not retrieve Gesiakowski. The victim's father then went to DeBruyn's house but was unable to convince his daughter to come outside. When Blake later returned to DeBruyn's house he discovered that DeBruyn and Gesiakowski had left.

After leaving the house on April 11, 2017, DeBruyn and Gesiakowski took a taxi to a Walmart store, where DeBruyn purchased additional cans

3

of air duster. The two then went to the Baymont Inn in Grand Haven, where DeBruyn rented a room. Blake Gesiakowski went to the motel and told the desk clerk that his daughter might be in danger, but the clerk said that there was nothing he could do. Blake then banged on the door of the motel room where the couple was staying, but the police arrived and warned Blake that he would be arrested if he did not leave.

The following morning, on April 12, 2017, at approximately 6:00 a.m., DeBruyn went to the front desk of the Baymont Inn and told the desk clerk to call 911 because Gesiakowski was not breathing. Although DeBruyn had a cell phone, he did not call 911. While the desk clerk called 911, DeBruyn returned to his room. When police arrived, they observed DeBruyn in the parking lot, smoking a cigarette. Police found Gesiakowski dead in the room. The room was very cold, and Gesiakowski's body was cold to the touch. In the room, police found four empty cans of air duster, but did not find any pills or empty pill bottles.

DeBruyn informed the police that he and Gesiakowski arrived at the motel the day before at 4:30 p.m. and that they "were just hanging out." He told police that they went to bed at approximately seven or eight p.m., but that Gesiakowski said that she did not feel well and went to the bathroom several times to vomit. At approximately 3:00 a.m., Gesiakowski again

vomited in the bathroom and again said that she did not feel well. When
DeBruyn woke up at approximately 6:00 a.m., he found Gesiakowski was
dead. The victim was found unclothed from the waist up. DeBruyn told the
police that she had worn clothes earlier, but she had complained that she
was very hot and had turned the air conditioning to a very cold setting.

Prosecutors charged DeBruyn with delivering a controlled substance
causing death, alleging that he delivered oxycodone, a Schedule 2
controlled substance, to Gesiakowski, who then died after taking it.

At trial, the prosecution introduced evidence that Gesiakowski died of
mixed-drug toxicity, caused by a combination of four of the substances
found in her system: oxycodone (a semisynthetic opioid pain reliever),
tramadol (a synthetic opioid pain reliever), fluoxetine (an antidepressant
branded as Prozac), and difluoroethane (a halogenated hydrocarbon used
as an aerosol propellant in compressed air dusters). As to the issue of the
cause of death, the prosecution called as witnesses toxicologist Dr.
Benedict Kuslikis, toxicologist Dr. Matthew McMullin, pathologist Dr.
Matthew Carr, and forensic pathologist and chief medical examiner Dr.
David Start. The prosecution's experts generally agreed that all four
substances contributed to the victim's death and that oxycodone, a
Schedule 2 controlled substance, was a substantial factor in the victim's

5

death. Dr. Start testified that oxycodone was the most significant factor in her death, while Dr. Carr testified that, assuming that the victim had not used oxycodone while incarcerated in jail, the amount of oxycodone she used on April 11, 2017, was alone enough to have caused her death.

Defense counsel argued that the prosecution failed to show that DeBruyn delivered oxycodone to Gesiakowski and also failed to prove that oxycodone was a substantial cause of her death. The defense further argued that serotonin syndrome, which is caused by the interaction of tramadol and fluoxetine, or the effect of difluoroethane alone, had not been excluded as causes of death. Defense counsel did not present an expert witness to support these causation theories but cross-examined the prosecution's experts on the theories that serotonin syndrome or difluoroethane caused Gesiakowski's death.

Following DeBruyn's conviction, the Michigan Court of Appeals remanded the case to the trial court for a *Ginther* [1] hearing on DeBruyn's ineffective assistance of counsel claim. During the hearing, the trial judge took testimony from DeBruyn's trial attorneys, as well as defense experts Dr. Gerald Shiener, a psychiatrist, and Dr. Randall Commissaris, Ph.D., qualified by the trial court as an expert in the areas of pharmacology and

---

[1] *People v. Ginther,* 390 Mich. 436, 212 N.W. 2d 922 (1973).

toxicology, regarding the cause of the victim's death. The prosecution again

called Dr. Kuslikis, Dr. Start, and Dr. Carr, who reiterated their opinions

offered at trial and responded to new matters raised by DeBruyn's experts.

After the hearing, the judge denied DeBruyn's motion for a new trial.

DeBruyn's conviction was affirmed. *People v. Debruyn*, No. 352274,

2022 WL 981281 (Mich. Ct. App. Mar. 31, 2022), *lv.den.* 978 N.W.2d 836

(2022).

DeBruyn now seeks a writ of habeas corpus on the following

ground:

> The Defendant should have been granted a new trial where he
> demonstrated that trial counsel seriously erred in failing to
> properly investigate or challenge the State's toxicology
> evidence. Counsel never consulted with an appropriate expert,
> was not aware of the relevant literature in the field, and simply
> hoped to secure the scientific [sic] he needed through cross-
> examination of the state's witnesses.

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), imposes the following standard of

review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not
> be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of
> the claim–

7

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of

his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.,* at 103.

## III. Discussion

DeBruyn argues he was denied the effective assistance of trial counsel.

To show that he or she was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two-prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id*. In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id*. To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Strickland,* 466 U.S. at 694. "*Strickland*'s test for prejudice is a demanding one. 'The likelihood of a different result must be substantial, not just conceivable.'" *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011)(quoting *Harrington*, 562 U.S. at 112). The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

More importantly, on habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable-a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)(quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. at 101. Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556

U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. at 664). Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner. *Id.* This means that on habeas review of a state court conviction, "[A] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101. "Surmounting *Strickland's* high bar is never an easy task." *Id.* at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

DeBruyn first argues that trial counsel was ineffective for failing to call expert witnesses to refute that DeBruyn supplied the victim with the oxycodone that was found in her blood stream. The gist of his argument is that the evidence shows that DeBruyn purchased and gave the victim Percocet, which contains oxycodone and acetaminophen. The autopsy did not find any acetaminophen in the victim's blood stream, although acetaminophen was found in her urine. Nonetheless, DeBruyn's proposed experts testified at the *Ginther* hearing that although acetaminophen breaks down in the bloodstream quicker than oxycodone, that nonetheless it should have been found in the victim's bloodstream so soon after she had taken the oxycodone that was found in her bloodstream. DeBruyn argues

11

that the lack of acetaminophen in the victim's bloodstream shows that it was not the Percocet which DeBruyn gave the victim that led to her death.

The trial judge denied this claim following the *Ginther* hearing in her opinion denying the motion for a new trial: She found the lack of acetaminophen in the blood to not be a substantial defense for three reasons: acetaminophen has a shorter half-life than oxycodone, the rate at which an individual's particular enzymes metabolize various substances, and the acetaminophen may have been below the cut-off for reporting. The judge found that the evidence collectively presented by Dr. Sheiner, Dr. Commissaris and Dr. Kuslikis shows that acetaminophen is metabolized quicker than oxycodone, sometimes twice as fast. The proofs did not show that the lab report's absence of acetaminophen in the blood was proof that acetaminophen was not in the blood at a lower level than the oxycodone. The judge also noted that it was "indisputable" that acetaminophen must have been in the victim's blood because it was found in the victim's urine. ECF No. 1-2, PageID. 20-21. The judge further noted that Dr. Commissaris' and Dr. Sheiner's opinions were conditioned on the victim having taken Percocet shortly before her death. Dr. Commissaris testified that the victim's blood contained a "measurable concentration" of hydromorphone, the metabolite of oxycodone, which indicates that she did not take the

pill(s) containing oxycodone shortly before her death, but long enough prior to her death for the acetaminophen to metabolize and the oxycodone to partially metabolize. *Id.* at PageID. 21. There was also evidence that Percocet pills come in different strengths and although the level of acetaminophen stays constant at 325 ng, the level of oxycodone varies between 2.5 and 10 ng. Although Dr. Sheiner testified that in a Percocet overdose one would expect to find high levels of both oxycodone and acetaminophen in the blood, the judge found the relevance of that testimony was diminished in a mixed drug toxicity case, where the prosecution did not need to show that the victim consumed enough Percocet to overdose but only she took enough Percocet to be a substantial contributing factor in her death. *Id.*

> The Michigan Court of Appeals rejected this claim on appeal:

> Defendant also argues that defense counsel was ineffective by failing to introduce expert testimony that Gesiakowski could not have consumed the Percocet defendant allegedly provided because Gesiakowski's blood tests did not indicate the presence of acetaminophen. At the *Ginther* hearing, appellate defense counsel presented as an expert witness Dr. Randall Commissaris, Ph.D., whom the trial court qualified as an expert in both pharmacology and toxicology. Dr. Commissaris opined that although the lab report indicates that Gesiakowski consumed oxycodone in the hours before her death, she did not consume it in the form of Percocet because the toxicology screen did not indicate the presence of acetaminophen in her blood.

In response, the prosecution recalled Dr. Kuslikis who testified that although the lab report did not indicate the presence of acetaminophen in Gesiakowski's blood, the report indicated that acetaminophen was present in her urine. He explained that acetaminophen metabolizes up to twice as fast as oxycodone and has a shorter "half-life," and thus it was not unusual that the lab report did not indicate acetaminophen in the blood, which is often present in a level too low to be indicated in a lab report. He further explained that drugs in the blood are excreted by the kidneys into the urine, and that the blood and urine levels of acetaminophen indicated in the lab report were "absolutely" consistent with a person having consumed Percocet. Dr. Start, the chief medical examiner, similarly testified that the lab report was not inconsistent with Gesiakowski having consumed Percocet. Because a review of the record demonstrates that acetaminophen not being indicated as present in the blood in the lab report did not establish that Gesiakowski did not consume Percocet, it was not a theory that could have defeated the prosecution's proof that Gesiakowski consumed Percocet provided by defendant. Defense counsel therefore was not ineffective for failing to present an expert witness to advance this theory.

*People v. Debruyn*, 2022 WL 981281, at * 7.

DeBruyn also argues that trial counsel was ineffective for failing to call an expert to show that the oxycodone was not a substantial cause of the victim's death because:

(1) the victim was opioid tolerant and 180 ng of oxycodone would not have been fatal to her and applying a Post Mortem Redistribution (PMR) would show that the oxycodone level of 180 ng was actually two to three times higher than the actual amount in the blood,

(2) The elevated level of Prozac combined with the Tramadol caused serotonin syndrome leading to a fatal seizure,

14

(3) huffing DFE lead either to a fatal seizure or a cardiac arrest,

(4) The lab report did not show the presence of Keppra, an anti-seizure medication the victim had been prescribed in jail, leading to the speculation that she stopped taking the drug and suffered a seizure.

The trial judge rejected the first theory when denying the motion for a new trial. The judge concluded that a re-tolerance theory presumed that the victim was so tolerant to opioids prior to going to jail that a dose of either 180 ng or 130 ng of oxycodone would not be fatal. The judge noted that there had been no evidence that the victim's opioid usage approached the level of a daily opioid user, such as the types of patients described by Dr. Commissaris. There was also no evidence that the victim acquired or sustained a tolerance to the 130 ng or 180 ng of oxycodone while she was in jail. There was thus no evidence to support a theory that the victim had developed a high tolerance to oxycodone such that the dosage she took would not be fatal. ECF No. 1-2, PageID. 24. The judge further noted that one of DeBruyn's attorneys, Mr. Christopher Langholz, consulted with an expert witness, Dr. Daniel Spitz, who opined that the 180 ng of oxycodone alone was enough to kill the victim. Counsel thus concluded that a toxicology expert would not be helpful. *Id.* Mr. Langholz did argue in his closing argument that 180 ng of oxycodone was not fatal, but the jury rejected the argument. *Id.,* PageID. 25. The judge further concluded that

15

PMR was inapplicable due to the short time between the death and autopsy. *Id.*

As to the serotonin syndrome, the judge noted that co-counsel Christine Tober testified at the *Ginther* hearing that they were able to bring this defense out through the cross-examination of the prosecution witnesses by bringing out that the victim had an elevated level of Prozac combined with similar acting Tramadol, and that she was hyperthermic and agitated before she died. *Id.*, PageID. 25. During the cross-examination of Dr. Kusliskis by co-counsel, he admitted that serotonin syndrome can be a cause of death if it causes too high a heart rate or arrythmia or if it causes the body temperature to rise too high. In the latter case, the autopsy would show the body tissue to have an almost melted texture. Dr. Kusliskis conceded that the elevated level of Prozac would have to be considered in the mixed drug toxicity in which other drugs played a part, although the tramadol was within the normal range. *Id.*, PageID. 26. Dr. Carr, on cross-examination, admitted that the serotonin syndrome "might have played some component" although he did not change his opinion that the combined levels of oxycodone and tramadol made central nervous suppression and respiratory suppression the more likely cause of death. *Id.*

16

The judge concluded that trial counsel's decision not to call an expert on serotonin syndrome was not ineffective. *Id.*

The judge rejected the claim that huffing DFE or duster was a significant cause of the victim's death. At trial, the prosecution presented a Dr. Matthew McMullin, who testified that the victim had 2.2 micrograms of duster in her blood. Dr. McMullin claimed the lowest lethal level of DFE was 29 micrograms and he opined that the DFE did not cause the victim's death. On cross-examination, defense counsel elicited from McMullin an admission that the level of DFE in the victim's blood was likely higher at the time of her death, Dr. McMullin admitting that the level of DFE at the time of death is "slippery" to measure. ECF No. 1-2, PageID. at 27. Dr. Kuslaskis testified at trial that the DFE could have been a player in the victim's death but not a "huge player." Counsel on cross-examination got Dr. Kuslaskis to admit that he did not know how the DFE sample had been treated and he further conceded that the level at death could have been higher than 2.2 micrograms. When Dr. Carr testified that 2.2 micrograms of DFE was not lethal, counsel on cross-examination obtained an admission from him that his opinion could change if the level of DFE in the blood was higher. Counsel attempted to get Dr. Start to change his opinion that the 2.2 micrograms of DFE in the victim's blood was not lethal by confronting him

with the fact that DeBruyn and the victim had purchased 19 cans of DFE in the days leading to her death, but Dr. Start did not change his opinion that he believed that oxycodone had been the main cause of death. *Id.*

The judge observed that defense counsel had used the prosecution's experts to present the theory that cardiac arrest or a seizure caused by huffing DFE was a major contributor to the victim's death and the jury heard and rejected it. *Id.,* PageID. 27-28. The judge further concluded that the proofs presented at the *Ginther* hearing did not establish that there was additional evidence presented at trial by which counsel could have educated themselves or presented expert testimony to establish huffing DFE as a substantial defense. Although Dr. Commissaris testified at the *Ginther* hearing that he had seen death from a DFE level as low as 5.6 micrograms, and appellate counsel had presented a treatise showing death as low as 1.1 micrograms, the judge concluded that not calling an expert on this issue did not deprive DeBruyn of a substantial defense that would have changed the outcome of the case. *Id.,* PageID. at 28.

The judge lastly concluded that counsel was not ineffective for failing to call an expert to suggest that the victim had died from a seizure because she had not taken the anti-seizure drug, Keppra, which she had been taking at the jail. The judge reasoned that no evidence had been presented

to show that the victim had a medically documented seizure disorder or that she had suffered a seizure in the past, nor was any evidence presented to show that jail personnel had not prescribed Keppra to prevent the victim from suffering withdrawal symptoms while she was incarcerated. *Id.*, PageID. 28-29.

The Michigan Court of Appeals rejected this portion of DeBruyn's claim:

> After investigating the role of oxycodone in Gesiakowski's death, defense counsel determined to cast doubt upon the prosecution's theory that oxycodone was a substantial factor in Gesiakowski's death by cross-examination of the prosecution's witnesses rather than calling a defense expert on causation. At the *Ginther* hearing, defense counsel explained that through cross-examination, they were able to use the prosecution's toxicologist and medical examiner to present defendant's theories that the level of oxycodone in Gesiakowski's blood was not extremely high, and that more significant factors in her death were the likelihood of serotonin syndrome, caused by the combination of tramadol and fluoxetine, and also difluoroethane from huffing air duster. The record supports that defense counsel at trial were able to present these theories through a thorough and knowledgeable cross-examination of the prosecution's experts.
>
> The record thus demonstrates that defense counsel investigated the cause of death by consulting a forensic pathologist and interviewing a toxicologist testifying for the prosecution, both of whom opined that oxycodone was a contributory cause that was a substantial factor in Gesiakowski's death, and defense counsel demonstrated command of the topic while cross-examining the prosecution's expert witnesses at trial; we therefore cannot

conclude that defense counsel failed to investigate causation. Similarly, we cannot conclude that defense counsel's strategy to present the defense theories through cross-examination of the prosecution's experts was objectively unreasonable. Counsel was not required to "shop around" until they found an expert willing to offer them a favorable opinion. We conclude that the trial court did not clearly err by determining that defense counsel's performance did not fall below an objective standard of reasonableness in their investigation of causation and determination of trial strategy.

*People v. Debruyn*, 2022 WL 981281, at * 7 (internal citation omitted).

The Michigan Court of Appeals further ruled:

Defendant further argues that defense counsel at trial was ineffective for failing to call an expert witness to testify that Gesiakowski's consumption of oxycodone was not a substantial factor in her death because (1) she was opioid tolerant from frequent opioid use, (2) the elevated level of fluoxetine and tramadol combined to cause serotonin syndrome and a fatal seizure, (3) huffing difluoroethane caused a seizure or cardiac arrest resulting in death, (4) the absence of Gesiakowski's prescribed anti-seizure medication in the lab report indicates that she had failed to take the medication and therefore was susceptible to seizure, and (5) post-mortem redistribution may have occurred, which may cause more oxycodone to be observed in the blood after death than was present in the blood at the time of death. We disagree that the record supports the viability of these theories.

With regard to opioid tolerance, Dr. Commissaris testified that Gesiakowski was unlikely to have died from consuming oxycodone because it was likely that she was opioid tolerant from previous opioid use. He testified that oxycodone will have less effect on someone with tolerance to the drug, that tolerance can arise relatively quickly, and that opioid tolerance will quickly reemerge in a former opioid user when he or she resumes use

20

of the drug. Dr. Commissaris conceded, however, that he had no personal knowledge of Gesiakowski's history of drug use, such as her use of drugs while in jail or following her release. Because Dr. Commissaris' speculation regarding Gesiakowski's potential for opioid tolerance was not supported by the facts of this case, it is unpersuasive, and defendant was not prejudiced by counsel's failure to present a defense expert in toxicology to advance this theory.

With regard to the possibility of a fatal seizure, Dr. Commissaris opined that a seizure appeared probable and could have been caused by (1) serotonin syndrome, resulting from the interaction of fluoxetine and tramadol, (2) huffing difluoroethane, (3) the cessation of Keppra (antiseizure medication prescribed for Gesiakowski while in jail), or (4) some combination of these factors. Dr. Commissaris noted that there was evidence that Gesiakowski felt hot on the night of her death, which is a symptom of serotonin syndrome. Defendant argues that individually or collectively this evidence demonstrates a reasonable probability of a different outcome had defense counsel called an expert witness to advance the theory that Gesiakowski died of a seizure caused by factors other than oxycodone. When questioned about mixed-drug toxicity, Dr. Commissaris agreed that "mixed drug intoxication" was "very likely" the cause of death, but opined that only tramadol, fluoxetine, and difluoroethane were related to seizures, and that oxycodone was the "least likely contributor" to Gesiakowski's death.

Dr. Commissaris' testimony that Gesiakowski suffered a seizure is purely speculative, however. Dr. Commissaris testified that Gesiakowski was at risk for a seizure, but there is no evidence that she, in fact, suffered a seizure; Dr. Kuslikis explained that seizures rarely leave evidence and that there was no evidence in this case that Gesiakowski suffered a seizure. Moreover, Dr. Commissaris' testimony does not demonstrate that oxycodone was not a contributory cause that was a substantial factor in Gesiakowski's death. Dr. Commissaris suggested that the other

21

substances combined to cause Gesiakowski to have a seizure causing death; however, the evidence would need to demonstrate that the seizure was the sole cause of harm to adequately contradict the prosecutor's assertion that oxycodone was a contributing cause that was a substantial factor in Gesiakowski's death. See *Bailey*, 451 Mich at 677 [2] (An intervening act that causes harm to the victim will "only serve to cut off the defendant's criminal liability when the intervening act is the sole cause of harm."). Dr. Carr testified that even if Gesiakowski suffered a seizure, mixed-drug toxicity caused her death and oxycodone was a substantial factor in her death. Defense counsel therefore was not ineffective for failing to call an expert witness to advance the theory that Gesiakowski suffered a seizure.

Dr. Commissaris also testified that post-mortem redistribution may have occurred and as a result the level of oxycodone in Gesiakowski's blood may have tested at a higher level after death than the level that actually was in her blood at the time of death. However, Dr. Carr testified that post-mortem redistribution was unlikely in this case because the autopsy was performed very quickly after the victim's death and that certain blood samples were taken from the victim's vitreous humor (eye), which is not susceptible to post-mortem redistribution. Further, Dr. Commissaris' testimony did not establish that if post-mortem redistribution had occurred it would have affected the level of oxycodone in the blood to the extent that it was no longer considered a substantial factor in Gesiakowski's death. Again, defense counsel was not ineffective for failing to call an expert witness to advance a theory that would not have negated the prosecution's proofs.

*People v. Debruyn*, 2022 WL 981281, at * 8–9 (additional citation omitted).

---

[2] *People v Bailey*, 451 Mich 657, 676; 549 NW2d 325 (1996), *amended* 453 Mich 1204 (1996).

The Michigan Court of Appeals finally concluded that DeBruyn was not prejudiced by counsel's failure to call an expert:

> We know certain things from the trial court record in this case. We know that the 23-year-old victim repeatedly implored defendant to obtain oxycodone for her use. We know that defendant obtained oxycodone in the form of 40 Percocet pills and that the next day defendant and Gesiakowski retreated to the motel room where she was found dead the following morning. We know that oxycodone was found in Gesiakowski's blood postmortem. We know that all of the prosecution's experts testified that the level of oxycodone in Gesiakowski's blood stream, either alone or in combination with other drugs, was sufficient to cause her death. And we know that both of the experts defense counsel consulted before trial opined that the level of oxycodone in Gesiakowski's blood stream was sufficient to cause her death either alone or in combination with the other drugs in her system. We are unable to conclude that had defendant presented largely speculative alternate theories of the cause of Gesiakowski's death, there would have been a reasonable probability of a different outcome at trial.

*People v. Debruyn*, 2022 WL 981281, at * 9.

Mich. Comp Laws § 750.317a proscribes delivery of a controlled substance causing death as follows:

> A person who delivers a schedule 1 or 2 controlled substance, other than marihuana, to another person in violation of ... MCL 333.7401, that is consumed by that person or any other person and that causes the death of that person or other person is guilty of a felony punishable by imprisonment for life or any term of years.

The elements of delivering a controlled substance causing death under this statute are (1) delivery to a person, (2) of a schedule 1 or 2

controlled substance other than marijuana, (3) with intent to deliver a

controlled substance as proscribed by Mich. Comp Laws § 333.7401, (4)

consumption of the controlled substance by a person, (5) resulting in the

death of that person from the consumption of the controlled substance.

*People v McBurrows*, 504 Mich 308, 319; 934 N.W. 2d 748 (2019). This

statute "punishes an individual's role in placing the controlled substance in

the stream of commerce, even when that individual is not directly linked to

the resultant death." *People v. Plunkett*, 485 Mich. 50, 60; 780 N.W.2d 280

(2010). Mich. Comp Laws § 750.317a is a general intent crime. *Id.* The

Michigan Supreme Court indicated that the statute "does not require the

intent that death occur from the controlled substance first delivered in

violation of Mich. Comp Laws § 333.7401. Rather, the general intent

required to violate Mich. Comp Laws § 750.317a is identical to the general

intent required to violate Mich. Comp Laws § 333.7401(2)(a): the delivery of

a schedule 1 or 2 controlled substance." *Id.*

 With respect to DeBruyn's claim that trial counsel was ineffective for

failing to call expert witnesses for the defense, the Supreme Court has

noted that a counsel's strategic decision as to whether to hire an expert is

entitled to a "'strong presumption' of reasonableness." *Dunn v. Reeves*,

594 U.S. 731, 739 (2021). The strong presumption of the reasonableness

24

of counsel's strategic decisions, when a claim of ineffective assistance of counsel involves a decision on whether to hire an expert, recognizes that defense lawyers have limited time and resources, and so must choose from among a number of strategic options, and such decisions are particularly difficult because certain tactics run the risk of harming the defense by undermining credibility with the jury or distracting from more important issues. *Id.* "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington v. Richter*, 562 U.S. at 111. The selection of an expert witness by a defense attorney is a "paradigmatic example" of the type of strategic choice that, when made after thorough investigation of the law and facts, is "virtually unchallengeable" under *Strickland*. *Hinton v. Alabama*, 571 U.S. 263, 275 (2014).

At the outset, this Court notes that defense counsel did consult with Dr. Daniel Spitz, the Macomb County Medical Examiner. Dr. Spitz opined that the amount of oxycodone contained in the victim's blood stream would be enough to be fatal. Counsel testified that he decided not to call Dr. Spitz because he did not believe that his testimony would be helpful. DeBruyn's current counsel argues that trial counsel was ineffective for consulting Dr.

25

Spitz because he was a pathologist, not a toxicologist, even though defense counsel had initially consulted with Dr. Spitz because the State Appellate Defender Office (SADO) listed him on their site as a toxicologist.

The question for this Court on habeas review is whether any fairminded jurist could agree with the Michigan Court of Appeals that counsel's failure to seek additional expert witnesses to testify about whether the oxycodone supplied by DeBruyn was the oxycodone found in the victim's blood stream and/or that it contributed substantially to her death satisfied the reasonableness standard enunciated in *Strickland. Davis v. Carpenter,* 798 F.3d 468, 473 (6th Cir. 2015). "That standard is a general one, governing a great blue-water of attorney conduct: from pre-trial discovery to plea-bargaining, from in-court trial tactics to post-verdict motions, from direct appeals to post-conviction challenges. The Supreme Court has charted only parts of that expanse." *Id.* The Sixth Circuit in *Davis* concluded that when faced with the question of whether trial counsel was ineffective for failing to seek additional experts to support the defense theory that the victim in that case had died after being accidentally dropped, the Tennessee Court of Appeals found itself in "open water.":

> The Supreme Court has never reached the specific questions that the Tennessee courts answered in this case: how many experts must an attorney contact before proceeding without one,

26

what kinds of outside advice can the attorney rely upon, and ultimately how hard must he try. The only buoy in sight, far off on the horizon, was the Court's guidance in *Strickland* itself that counsel's efforts must be within "the wide range of reasonable professional assistance [.]" 466 U.S. at 689, 104 S.Ct. 2052. That rule is as general as they come. And "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

*Id.,* at 473–74.

The Sixth Circuit concluded that the Tennessee Court of Appeals did not unreasonably apply *Strickland* by concluding that trial counsel's efforts to find a medical expert to testify at a second murder trial that the infant's fatal injuries could have been sustained when the habeas Petitioner accidentally dropped his child were professionally reasonable. *Id.* at 474. Counsel tried to convince an expert from the first trial to testify at the second trial and worked side-by-side with the first expert's attorney to find another expert when the first expert refused to testify a second time. Counsel also called one or two doctors himself. *Id.* Although the Sixth Circuit acknowledged that trial counsel could have done more than he did to find another expert, fairminded jurists could conclude that counsel's efforts to find an expert "fell in the permissible zone between "best practices" and outright incompetence." *Id.*

27

"Effective assistance does not require counsel to continue contacting experts until he found one...willing to testify against the prosecution's theory of the case." *Flick v. Warren*, 465 F. App'x 461 465 (6th Cir. 2012)(Petitioner's counsel in a second-degree murder prosecution was not ineffective for failing to call an expert to challenge the science underlying Shaken Baby Syndrome, after counsel had contacted three doctors seeking help with the case and had received unfavorable responses from all three). DeBruyn's trial counsel did consult with an expert witness, who informed counsel that he believed that the amount of oxycodone found in the victim's blood stream was sufficient to cause her death.

Secondly, although counsel did not call an expert witness, counsel were able to elicit favorable testimony from the prosecution's witnesses in support of their theory that that the level of oxycodone in Gesiakowski's blood was not extremely high and that more significant factors in her death were the likelihood of serotonin syndrome, caused by the combination of tramadol and fluoxetine, and also difluoroethane from huffing air duster.

"In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Harrington v. Richter*, 562 U.S. at 111. A defense counsel's decision to cross-examine a prosecutor's experts concerning their findings, instead of calling an expert witness for the

defense to challenge that expert's conclusions, has at times been held to be a reasonable trial strategy that defeats a habeas petitioner's ineffective assistance of trial counsel claim. *See Tinsley v. Million,* 399 F.3d 796, 806 (6th Cir. 2005); *See also Jackson v. McQuiggin,* 553 F. App'x 575, 580-82 (6th Cir. 2014). Counsels' decision to cross-examine the prosecution's various experts, in lieu of calling an expert, is a reasonable one that defeats petitioner's claim.

Finally, as the Michigan Court of Appeals noted, DeBruyn failed to show that he was prejudiced by counsels' failure to call an expert witness in light of the substantial evidence against him.

In order to establish prejudice from counsel's failure to consult with or call an expert witness, a habeas petitioner must show the "likelihood of a different result" is "substantial, not just conceivable." *See Maze v. Lester*, 564 F. App'x 172, 183 (6th Cir. 2014).

There was no dispute that DeBruyn had supplied oxycodone to the victim in close proximity to her death by providing her Percocet pills. Although the medical examiner did not find any acetaminophen in the victim's blood stream, he did find acetaminophen in her urine, which would tend to buttress the prosecution's theory that the Percocet that DeBruyn gave to the victim was the source of the oxycodone found in her body. The

29

prosecution's experts gave valid reasons for why the acetaminophen might not have been found in the victim's blood stream, namely, that it metabolizes at a quicker rate than oxycodone, as well as the fact that acetaminophen could have been in the victim's blood, but at a level below that for being detected in the bloodwork. In any event, DeBruyn's proposed experts could not explain away why acetaminophen was found in the victim's urine. Again, this fact tends to buttress the prosecution's theory that the Percocet given by DeBruyn to the victim was the source of the oxycodone recovered from the victim.

Nor can DeBruyn show that he would have likely prevailed at trial by calling his proposed experts to suggest that the oxycodone was not a substantial cause of the victim's death. The defense experts' suggestion that the amount of oxycodone found in the victim would not have been fatal because the victim had developed a tolerance for that level of oxycodone due to her addiction to oxycodone would have been undercut by the fact that the victim had been in jail for over eight months where she presumably had no access to oxycodone or other opiates. There was certainly no evidence presented to the state courts or to this Court to suggest that the victim had been using opiates while incarcerated, nor was convincing evidence presented that the victim could have built up a tolerance for

oxycodone in the brief time that she had been released from jail prior to her death. Indeed, DeBruyn's expert, Dr. Commissaris, conceded that he had no personal knowledge of the victim's history of drug use, particularly her use of drugs while in jail or following her release from jail.

With regard to suggestion that the victim's death was caused by a fatal seizure, caused by (1) serotonin syndrome, resulting from the interaction of fluoxetine and tramadol, (2) huffing difluoroethane, (3) the cessation of Keppra (antiseizure medication prescribed for the victim while in jail), or (4) some combination of these factors, there has been no showing that the victim actually suffered a seizure or had a history of seizures. Thus, DeBruyn's proposed expert's testimony would have been purely speculative.

Moreover, as the Michigan Court of Appeals noted, the evidence would need to demonstrate that the seizure was the sole cause of harm to the victim to adequately rebut the prosecutor's theory that oxycodone was a contributing cause of death. Under Michigan law, "joint mutual causes do not excuse culpable behavior." *Danielak v. Brewer*, 747 F. App'x 339, 345 (6th Cir. 2018)(Under Michigan law, sufficient evidence supported jury's finding that heroin or combination of heroin and cocaine, rather than solely cocaine, was cause of victim's death as required to support conviction of

defendant who delivered heroin to victim for delivery of a controlled substance, causing death; victim died of a pulmonary edema, which was more consistent with a death caused by heroin, and not of a heart attack, which was more consistent with a death caused by cocaine). DeBruyn has failed to make this showing.

This Court concludes that the Michigan Court of Appeals' rejection of DeBruyn's ineffective assistance of counsel claim was reasonable, precluding habeas relief.

## IV. Conclusion

Before DeBruyn may appeal this Court's dispositive decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R.App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v.*

*Cockrell,* 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id.* at 336-37. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

A habeas petitioner's ineffective assistance of counsel claim must make a substantial showing of the denial of a constitutional right so as to justify the issuance of a certificate of appealability. *See Skaggs v. Parker*, 235 F. 3d 261, 266 (6th Cir. 2000). A habeas court should grant a certificate of appealability if jurists of reason could find it debatable that trial counsel had been ineffective. *See Phillips v. Pollard*, 587 F. Supp. 3d 627, 635 (E.D. Mich. 2021). Although the Court believes that it was correct in its ruling, the Court will grant a certificate of appealability to DeBruyn because jurists of reason could find it debatable that trial counsel was ineffective. *Id.*

### V. ORDER

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus (ECF No. 1) is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **GRANTED.**

s/Shalina D. Kumar
Hon. Shalina D. Kumar
Dated: June 28, 2024                United States District Judge